# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# OCALA DIVISION

Frank Louis Amodeo,

Case No.  5:21-CV-527-RBD-PRL

Petitioner,

v.

Director of Bureau of Prisons
Regional Reentry Center in
Wildwood, Florida

Respondent.

## AMENDED
## FRANK AMODEO'S VERIFIED STATEMENT POST-SENTENCING OF HIS POST-SENTENCING ACTIVITIES

The Constitution and Congress provide that a punishment for a federal crime must not be harsher or longer than necessary to punish the particular individual for a particular crime. 18 U.S.C. § 3553 (a)(1); See Amend. V. In 2009, for five tax-related crimes, a federal court sentenced Frank Amodeo to 270 months in prison. In that proceeding, the court denied Amodeo the assistance of unconflicted counsel and overlooked that, as a matter of law, Amodeo was mentally incapacitated. These fundamental flaws in the criminal process help explain why Amodeo was convicted despite considerable evidence of his factual innocence. A miscarriage of justice, which would warrant Amodeo's request to have his sentence commuted to time served. But there's other reasons to reduce Amodeo's punishment:

1

1.    The BOP is unable to provide adequate medical care for Amodeo's mental disability and physical illnesses; hence a prison sentence constitutes a disparate and extraordinary punishment.

2.    During Amodeo's twelve years of incarceration, he has demonstrated outstanding character and exceptional rehabilitation, therefore further imprisonment serves no legitimate purpose.

3.    Amodeo's history establishes that he is not a risk to the community; thus, additional imprisonment does not serve the ends of justice.

## BACKGROUND

Mr. Amodeo's case involves an extremely complicated series of acts and transactions that resulted in five 2006 tax-related crimes. Unfortunately, despite numerous proceedings, no court has reviewed the merits of Amodeo's factual innocence claim, nor his claim of ineffective assistance of conflicted counsel, nor the significance of Amodeo's mental illness vis-à-vis his alleged criminal conduct. For these purposes, Amodeo does not address his allegation of innocence.

Because even if Amodeo were guilty of the alleged crimes his mental illness is significant to determining an appropriate sentence. Amodeo's sentencing argument is simple: Amodeo's brain disease (Bipolar 1-Disorder with psychotic tendencies and chronic delusions) substantially mitigates his culpability for the alleged crimes to which he pleaded guilty; a plea entered without either the assistance of *unconflicted* counsel or the knowledge of the State guardianship court. And a plea entered to a crime which, a mountain of evidence shows, never occurred.

The miscarriage of justice becomes a travesty of justice in the light of the Federal Bureau of Prisons inability to provide Amodeo with the proper medical care. *See in re Guardianship of Frank*

*Amodeo*, 2008-cp-1369 (Ninth Judicial Circuit, April 2017.) (State of Florida's 2017 Capacity Evaluation conducted under BOP auspices); (2021 Inspector General Report, fn. 11 infra). A deficiency that in COVID-19-era transforms Amodeo's prison term into cruel and unusual, if not, capital punishment.

For most of his life, Amodeo has suffered from bipolar disease, experiencing symptoms as early as late adolescence. Numerous public and private medical institutions[1] diagnosed Amodeo with a rapid-cycling variant of the disorder. These diagnoses occurred both years before and years after the time period of the alleged crime. Notably, since his conviction, Amodeo has persistently attempted to prove his factual innocence, explaining that a variety of intent-negating events including his rapid-cycling bipolar disorder (with psychotic features and chronic delusions) negated an essential element of the offenses-willful intent. Mr. Amodeo's §2241 habeas corpus for want of jurisdiction and the jurisdictional issue is pending in the United States Supreme Court (11th Cir. No. 17-15456). *See Amodeo v. Warden*, 984 F. 3d 992, (11th Cir. 2021). To date, no court has reviewed the merits of Mr. Amodeo's actual innocence (lack of mens rea) claim.[2]

1.  **The BOP lack of medical resources renders Amodeo's imprisonment fundamentally unfair and unconstitutional. BOP's inability to manage the COVID-19 pandemic renders Amodeo's imprisonment fatal.**

    **A. Government past treatment of Amodeo is medical malfeasance**

    The Law imposes on the United States government a duty to provide medical care to

---

[1] Among those institutions are Harvard-affiliated Mclean Pavilion. The Social Security Administration, The United States Probation Office, and the State of Florida. United States v. Amodeo; 6:08-cv-0176-Orl-JA-LRH (M.D. Fla. 2017) (Doc. 270, Appendix 1).
[2] Evidence of Amodeo's actual innocence can be examined at TheFrankAmodeoStory.com; and his innocence narrative is contained in *Amodeo v. Warden*, No. 5:17-cv-284-Oc-10PRL (M.D Fla. 2017) (Doc. 1) (Doc. 3) (Contains the evidence)

3

federal prisoners.[3] The United States ignored its constitutional and legal obligations when it failed to provide timely or proper medical care for Amodeo's health condition. Moreover, the United States' improper medical care crippled Amodeo and, more worryingly, in the COVID-19 era, continued inadequate care will likely result in his premature death.

After, the district court sentenced Amodeo to twenty-two and a half years in prison, the U.S Attorney General sent Amodeo to the Federal Correction complex at Coleman, Florida and housed him in the Coleman Low- Security Federal Prison. Although the Federal Bureau of Prisons was expressly aware of Amodeo's bipolar disorder — which the Social Security Administration described as the most severe presentation of the disorder that they had ever seen[4] - the BOP failed to provide Amodeo the prescribed care; in some instances, failed to treat him altogether.[5] As an inmate, the law entitled Amodeo to the medical treatment prescribed for his mental and physical illnesses, including hypertension, type II diabetes, obesity, sleep apnea, asthma, and axis-I bipolar disorder.[6] Despite Amodeo's medical conditions, and the prison's knowledge of the same, the prison failed to comply with the prescriptions or treat Amodeo's conditions.[7] Moreover, the prison placed Amodeo in an environment that exacerbated his physical ailments and put his life in jeopardy.

The BOP fed Amodeo a diet of sugars and sodium, nutrients contraindicated by his hypertension and diabetes.[8] On top of which, the BOP regularly plied Amodeo with foods labeled

---

[3] The Relevant regulations can be found in Title 28, Part 549 of the Code of Federal Regulations, and the relevant BOP policy statements are PS 6010.05, Health Services Administration, and PS 6031.04, Patient Care.

[4] 6:08-cr-0176 (M.D Fla) (Doc 270, Appendix, Dr. Cydney Yersulamei)

[5] BOP Medical Records 2017 at _____

[6] 2017 Capacity Report at _____

[7] REPORT need a report showing diabetes is aggravated by sugar and hypertension by sodium.

[8] REPORT

4

"not fit for human consumption".[9] Further, the BOP housed Amodeo in a facility so immersed in black mold, that numerous staff members refused to work in the same location.[10] To make matters even worse, the water in Mr. Amodeo's facility was so polluted that it resulted in the invalidation of warranties covering Coleman's multimillion dollar HVAC system.[11]

In sum, the lack of medical care and the inadequate physical facilities took Amodeo to the brink of death with an (a)(1)(c) of 11.5 [diabetes] and blood pressure consistently 220 over 127 (critical hypertension). Not to mention, a decade of maltreatment for his mental illness.[12]

## B. Today, if Amodeo were imprisoned, the COVID-19 pandemic puts him at imminent risk of death.

The advent of the COVID-19 pandemic makes Amodeo's circumstances much worse. Given that prison conditions make it impossible for an individual to protect oneself from COVID-19,[13] the likelihood that a prisoner becomes infected is magnitudes higher than a nonprisoner.[14] Succinctly, the COVID-19 pandemic, a prison's physical limitation when conjoined with Amodeo's five comorbidities (Diabetes, Hypertension, Obesity, Asthma, and Sleep Apnea), lead to the horrendous result that, in prison, Amodeo's chances of dying are near certain.

---

[9] https:// www.dailymail.co.uk/news/article-8208809/Former-Mrs-Florida-dishes-30-day-stint-prison .html

[10] https://www.prisonlegalnews.org/news/2019/apr/2/it-smelled-death-reports-mold-contamination-prisons-and-jails/

[11] see, Department of Justice / Office of the Inspector General Pandemic Response Report 21-026, Remote inspection of Federal Correctional Complex, Coleman January 2021.

[12] 2017 Capacity Report at 11.

[13] https://www.thelancet.com/action/showPdf?pii=S0140-6736%2820%2930984-3

[14] Id

The pandemic illuminated defects imbedded in the federal prison system; inherent defects that even the BOP's pandemic action plan could not overcome.[15]

Amodeo is housed at the FCC Coleman, which is one of the BOP's most populated prison. The prison's physical structure, as well as the endemic lack of financial and human resources, made it impossible for Coleman staff to comply with CDC minimal guidelines for protecting inmates from COVID-19 exposure.[16] The Inspector General showed that common measures to mitigate the spread of COVID-19 were discouraged or "[i]mpossible" to implement at Coleman. A finding consistent with that of every other federal prison.[17] An example of COVID-19-caused chaos, prisons banned staff from wearing masks for about a month when the pandemic first began surging in Florida, ironically inmates and staff who were threatened with discipline if they wore their mask.[18]

Moreover, like every BOP facility, Coleman found it extremely difficult to contain the pandemic within the facility;[19] Due to limited space, it is not possible to implement prescribed social distancing procedures. Understaffing made employing contact tracing impossible, and "selective contact" was impractical because new individuals are continuously introduced into a prison population.[20]

At a time when an adequate number of medical personnel was necessary for the proper implementation of CDC guidelines and was critical to controlling the transmission of COVID-19–especially in correctional settings–the BOP health services were understaffed, (roughly

---

[15] https://www.forbes.com/sites/walterpavlo/2020/04/23/bureau-of-prisons-had-a-response-plan-for-a-pandemic-but-delayed-action/?sh=2c29dba3d974

[16] See 2021 Inspector General Report

[17] Id.

[18] Id at at14-16

[19] Id

[20] Id at 8-10

6

80%).[21] That staffing deficiency has increased sharply in the latest stage of the pandemic (at present 65%).[22]

The BOP implemented its pandemic protocol, but even with the action plan,[23] the likelihood of a prisoner contracting COVID-19 is much greater than a nonprisoner. Recent reports revealed that COVID-19 infection rates for BOP inmates is 1 in 5,[24] while infection rates for staff is 1 in 8.[25] Compared to the general population infection rate, which is less than 1 in 10.

## Delta Variant

Florida has become the new epicenter for the pandemic with the spread of the Delta variant of the COVID-19 virus (Center for Disease Control and Prevention. (n.d.). CDC COVID Data Tracker. Centers for Disease Control and Prevention. Retrieved August 1, 2021, from https://covid.cdc.gov/covid-data-tracker/#trends_dailycases). A variant that infects those who were previously infected and those who were vaccinated. Currently, Florida ranks in the top three for highest total number of COVID-19 cases, as well as hospitalizations. *Id. (Retrieved September 6, 2021).* In response to the spreading Delta variant, Coleman returned to a full lockdown status. The prison's lockdown is a vain effort to mitigate the virus's spread through the prison population as the number of cases area on the rise and lockdown status has return. Neither the lockdown nor vaccine can halt the spread of the Delta variant through the overpopulated and poorly designed (for pandemic conditions) designed prisons. And even if Amodeo could be vaccinated (and he cannot) it would not help him since a mild case of COVID-19 will kill him. In short, if

---

[21] Id at 1
[22] Id at 1
[23] BOP Action Plan https://crsreports.congress.gov/product/pdf/R/R46297
[24] https://apnews.com/article/pandemics-race-and-ethnicity-prisons-united-states-coronavirus-pandemic-0bef0673013aa579551db5ad61b885e0
[25] Id at iii-iv

7

imprisoned, Amodeo and (any other inmate) is exposed to a substantial risk of infection and for Amodeo this is fatal.

We emphasize COVID-19 poses a substantial individualized risk to Amodeo-his medical doctors have instructed that he is ineligible for the vaccines. *In re Guardianship of Frank L. Amodeo*, 2008-cp-1369 (April 2021 Physician's Report). In essence, even a vaccine's limited protection cannot help Amodeo,  his illnesses combined with a COVID-19 infection indicate that Amodeo will likely die if infected. A probability of infection and death that only increases with the emergence of the Delta-variant of COVID-19 and the other mutation to come.

## Variants and Vaccine

It is noteworthy that, the dangers for COVID-19 for those like Amodeo, are far from over. The arrival of vaccines mitigates against the risk of exposure and death but only slightly so. As we have learned the Delta variant breaks through the vaccine's protection and infects even those previously infected.[26] Beyond suffering personal illness, these individuals become carriers for these variants and infect those with lesser, or like Amodeo, no immunity.[27] Even more disturbing COVID-19 variants (mutations) are not yet finished.[28] Most recently, the arrival of the Mu variant[29] and the C.1.2. variant,[30] both of which are capable of circumventing vaccine defenses, and where these variants appear they take hold and are persistent.[31] In a prison or jail environment, persistence would become a plague, for those like Amodeo, prison becomes a gas

---

[26] See Harvard-affiliated McLean Hospital evaluation, Dr. Susan Park identified "Mr. Amodeo's extreme sensitivity" to medications. (United States v. Amodeo, 6:08-cr-0176, Doc. 270, Appx 1.
[27] https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html
[28] https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/a-new-strain-of-coronavirus-what-you-should-know
[29] https://www.who.int/en/activities/tracking-SARS-CoV-2-variants/
[30] https://www.who.int/en/activities/tracking-SARS-CoV-2-variants/
[31] https://www.who.int/en/activities/tracking-SARS-CoV-2-variants/

8

chamber.

## 2. Amodeo's post-sentencing behavior reveals outstanding character and exceptional rehabilitation

### A. Amodeo the Advocate

Amodeo's physical and mental health are not the only factors necessitating a significant sentence reduction. Amodeo's post-sentencing conduct demonstrates exceptional rehabilitation. After Amodeo's 2009 sentencing, Amodeo became a vital resource for inmates and prison staff alike. During Amodeo's time in prison Amodeo assisted thousands of individuals and achieved remarkable outcomes for many of those he assisted. In fact, while at Coleman, the Supreme Court granted two petitions for certiorari on cases Amodeo filed for others.[32] Moreover, he advised more than 8,000 inmates during his 11 years, he corrected 741 sentences, saving inmates 1997 years of unnecessary imprisonment, all while saving taxpayers over \$125 million.[33]

In addition to Amodeo's foregoing law-work activities (usually conducted from his prison-allowed personal office) Amodeo was also Coleman's longest-tenured law clerk (11 years). He maintained the law library and ensured that it was in compliance with both the Bureau of Prisons policy statements and the guidelines of prison-accreditation agencies. Amodeo did all of this while he assisted inmates with searching for cases, filling out forms, locating secondary materials, etc.

Amodeo's post-incarceration advocacy activities are unique, and his rehabilitation was outstanding.

### B. Amodeo the Teacher

Prison counselor Bruce Chambers engaged Amodeo to develop a series of unit-based

---

[32] Anthony Grant Jackson v. United States, _____ U.S. _____ (2015); Michael Jackson v. United States, ___ U.S. ___(2010).

[33] Frank Amodeo's Biography at Correcting Injustice.com; Article from Press Release.

9

vocational or educational classes. Not only did Amodeo develop the program, but also, he taught approximately thirty (30) of the classes himself. These classes averaged fifteen to sixteen students at a time. Further, Amodeo was an Adult Continuing Education ("ACE") instructor. ACE is a BOP-mandated program for adult continuing education. Amodeo taught business entrepreneurship and legal research courses.[34] Amodeo taught at least one, usually two, classes per quarter – a volunteer task that required him to sacrifice his recreational time, but a sacrifice he willingly made because of the benefits received by other inmates. During those years, ACE classes generally had twenty-five seats, but Amodeo's courses were standing room only with upwards of 35 - 40 people in his classes.[35] Ironically, some of Amodeo's proudest moments were not about showing a person how to be an entrepreneur but rather showing inmates how to, and why to, be a good employee. A point exemplified by those like Russell Davis and Felix Polanco who upon release from prison turned Amodeo's legal research education into substantial positions as paralegals.

## C. Mentor and Tutor

Through his earned, personal "law" office, Amodeo was able to educate countless inmates on how to effectively prosecute their cases within the federal court system. Amodeo further conducted seminars for groups of inmates on topics like bankruptcy, divorce, immigration detainees, and power of attorneys Notably, Amodeo provided inmates (and staff) extensive education on the First Step Act and the Time Credit System, including prison-wide seminars.

Amodeo having completed the equivalent of an LLM in appellate advocacy has begun the process of conducting CLE for practitioners and externships for law students that emphasize clarity,

---

[34] Sample of certificates Composite Exhibit 1
[35] It is worth noting that most classes provided at Coleman would only average 5-10 inmates in attendance.

10

directness, and efficiency in writing and research.

## D. Toastmasters

Additionally, for approximately two years under the supervision of Ms. Pizarro, Amodeo helped establish and run a "How to communicate" chapter of the "Toastmasters Club" at Coleman.[36] Much to the surprise of Coleman administrators, attendance at these meetings was consistently over one hundred people per session. A volume of attendance that required the prison to move the meetings into the chapel. The reason so many inmates attended these events was because the speeches were practical and educational. Amodeo effectively taught the attendees that communication was a universal skill that cut across all professions and jobs, thus anyone could benefit from learning how to communicate better. In other words, Amodeo convinced the skeptical prisoners that learning "what to say", and "how to say it," are valuable skills.

## E. Answer Man and Advisor

In addition to being Coleman's longest tenured law clerk, Amodeo also served to train other inmates as law clerks and to assist other inmates. On any given day, inmates would walk with Amodeo from his unit to the library (which is about 50-75 yards), and Amodeo would answer dozens of questions: "Did you see this?" "What does this case mean?" "Oh, I got this paper back?".

A fair estimate is that while in prison, Amodeo formally taught more than 1,100 people and informally tutored thousands. On some days, advisor Amodeo would answer as many as 180 questions posed by inmates, or staff members. For example, the correction officers' union had a magnitude of problems related to labor negotiations, and so the guards would come to Amodeo at night, asking questions related to labor law and contract terms. Ultimately, Amodeo's advice

---

[36] Exhibit "2"

11

resulted in various changes in union and BOP policy, one of which allowed for an (effective) increase in the retirement age above fifty-seven. This helped alleviate the prison's labor shortages.[37]

## F. Amodeo the Mediator

In addition to educating Coleman's inmates, Amodeo regularly helped reduce stress and violence in the facility. Amodeo's willingness to assist all inmates, and to do so for free, made him invaluable to the prison staff and inmates alike. Inmates are normally puzzled and disconcerted over changes in the law or matters within their cases, with Amodeo they had a safe, reliable source of advice. Staff members routinely sent inmates to Amodeo for legal (and other) advice.

The COVID-19 quarantine illuminated Amodeo's importance to the prison. During the quarantine, staff members shuttled legal papers between housing units in order to ensure inmates could receive Amodeo's assistance. An action not only demonstrating the true noble character of many prison staff, but also showing their respect for Amodeo's work. Plus, the staff recognized how their gracious conduct and Amodeo's legal acumen helped calm the angst felt by the otherwise helpless prisoners who were otherwise dumbfounded by the byzantine judicial system. Many prisoners openly stated they were keeping their cool because it was important, they do not get in trouble, since that would cause them to lose contact with Amodeo.

## G. Amodeo Liaises between Prison Staff and Inmates

On one occasion, some inmates allowed a personal dispute to become not only violent but also to become "gang respect" – related. This ultimately resulted in several incidents. One morning at about 6:00 am, as prisoners began going to breakfast, two ranking-members of opposing gangs found Amodeo and said, "Mr. Frank we know that the staff listens to you when

---

[37] See 2021 Inspector General Report

you talk to them and there's a problem. Last night these two guys got beat up and now there's going to be reprisals and then there's going to be orders for more reprisals and this might even bleed over to our families on the outside. We can't be seen talking to a staff member so let us tell you about it and you do what the right thing is." The dispute involved members of two gangs the Bloods and the Crips, one of the culprits, Brian, was a "client" of Amodeo. Amodeo resolved the situation before further violence could take place. Notably, Amodeo continued to assist Brian and a year later got the 11th Circuit to reverse a District Court decision that gave Brian a chance to return to district court and reduce his sentence by five years.

### H. Amodeo Liaises between Inmates

Amodeo not only resolve disputes between gangs, but he also bridged gulfs between competing races.[38] For example, there was a dispute between certain Puerto Rican and Cuban inmates over radio parts. Leaders of both groups were "clients" of Amodeo. Amodeo went to them and said, "you have a $2000 per hour, (ex)-attorney, handling your cases for free and you are arguing over $15 worth of radio parts. How "stupid" can you be?" Amodeo's intervention deterred violence that would have resulted at the disputes spreading among the members of each crew.

On numerous occasions, Amodeo was brought in to deescalate tensions among competing gangs or groups of all races and ethnicities, and to negotiate peace among confrontational inmates.

Another example, leaders from the Vice Lords and the Gangster Disciples[39] (two, rival

---

[38] Amodeo's assistance epitomized ecumenicalism: he represented Blacks, Whites, Hispanics, Orientals, Muslin Imams, Jewish Rabbis, Protestants, Catholics,Hindus, Wiccans, Buddhists, Agnostics, and Atheists, etc.

[39] "Southside" and "Steel"; names of the gang's leaders

13

African American gangs) came to Amodeo and said: "Hey, we have a dispute, and we would like you to resolve it. We will make you an honorary member of both gangs so that you can resolve this dispute and then, Frank, there won't be any violence. We like each other here at Coleman and we don't want to carry this thing on, but when you get orders from the outside, you have to follow orders and do certain things. But, if you resolve this dispute for us, they're going to know the lawyer guy did it and that'll be it. It'll be over." Amodeo successfully resolved the dispute, no violence occurred.

## I. Amodeo Improves Prison Conditions

Amodeo's assistance in reducing violent conduct at Coleman extended even further than mentioned above. On many occasions, Amodeo would warn inmates not to sell drugs, "do not bring drugs in the units." Although he advised these inmates that no one would "judge [their] behavior," as everyone incarcerated at Coleman was, for all intents and purposes, a convict; he also assured them that (drug selling) behaviors would not be tolerated because it hurt other inmates. That is, this type of misconduct not only violated prison rules but also interfered with inmates' lives. Amodeo's principal goal with such warnings was to ensure that innocent inmates-including those selling food and other "honest hustles" (services)-were able to do so without undue interference of either prison staff or the disruptive behavior of drug-addicted prisoners. When staff suggested Amodeo could benefit from informing staff about those bringing drugs into the Coleman facilities, he refused to accept, or ask for, anything.[40] In short, Amodeo was essentially an inmate-empowered watch dog, ensuring that if a fellow inmate ran

---

[40] A review of Special Investigative Services ("S.I.S.") reports at Coleman will reveal Amodeo's active assistance in helping the prison control the worst illegal activities; it is noteworthy that on more than one occasion, when the prison believed an inmate should get a (Rule 35) sentence reduction, they turned to Amodeo to represent the inmate. See, e.g. Leon Williams

afoul of the rules and put other inmates at risk, there was a method to resolve the situation without undue harm to the innocent or violence to anyone , i.e., Amodeo would step in and take what actions were necessary.

**J. Amodeo saves a life**

In another remarkable instance, Amodeo helped to avert the murder of a high-ranking staff member at Coleman.[41] In 2019, violence erupted at a halfway house between members of two Puerto Rican gangs. As a result, a member of one gang was murdered,[42] the victim was previously housed with Amodeo at Coleman. The gang victims believed that a Coleman staff member's actions put the victim in harm's way. Because of this belief, the slain member's gang made threats against one of Coleman's staff members, as well as that staff member's family.

Succinctly, in retaliation for the staff member allegedly putting the murder victim (the gang's member) at risk from other gangs, the victim's gang would punish the staff member. In other words, as retribution for placing their fellow gang member in an unsafe halfway house, the gang threatened to kill the staff member or his family. After the threat became known, a Coleman staff member approached Amodeo and asked for his assistance in explaining that the targeted staff member was not in any way responsible for the halfway house placement or the resulting murder.

The Coleman staff member called for Amodeo over the prison PA system so as to make it look as if Amodeo was being contacted for another reason. The Coleman staff member was concerned about bringing the problem to Coleman internal security, the BOP, or the FBI. In the staff member's opinion, contacting them could do more harm than good. Plus, the staff member

---

[41] Coleman staff member's name omitted intentionally for purposes of safety and privacy. Available, if needed, under seal.

knew Amodeo had credibility with inmates and what Amodeo said would be believed. Hence, if Amodeo verified the staff member was not responsible, then the threat would dissipate.

Amodeo, as factfinder, requested evidence to support the staff member's claims, this allowed Amodeo to credibly convey what happened to individuals who could convince the gang's shot-callers that retribution was not the thing to do. Amodeo conveyed the information; the gang did not take any action. Afterwards, Coleman staff again asked Amodeo if there was anything that could be done to thank Amodeo for his efforts. Again, Amodeo said "no," explaining that doing the right thing is usually sufficient reward.

## K. Amodeo as Counselor

Amodeo was instrumental in helping inmates with mental health disorders because often they had no friends to talk to – prison counselors would send these inmates to Amodeo because of his ability to relate to their illness, due in great part to his own mental health struggles, as well as his uncanny patience with other people. Unsurprisingly, inmates found it easy to talk to Amodeo because "he's crazy also", so he performed this service for Coleman counselors for almost eight years.

## L. Amodeo's Prison Time

These are but a few concrete examples of Amodeo assisting prison inmates and staff with resolving conflicts and concerns; events that ultimately prevented significant violence and made prison life a bit safer. These daily efforts to maintain peace go largely unreported in Amodeo's normal official BOP records, since such disclosures inherently put any prisoner at risk from other inmates. The BOP keeps them secret, but much is contained in the prison's more comprehensive SIS records and over four dozen staff members are willing to testify on Amodeo's behalf. In sum, Amodeo consistently took the right action. He greatly reduced stress and violence in Coleman,

16

and he was instrumental in helping virtually all individuals who crossed paths with him. Which is why he is considered a friend to all and earned the respect of everyone he encountered.

## M.  Under Home Confinement, Amodeo's Efforts Continue.

Since his release to home confinement in June of 2020, Amodeo has continued to work as a consultant, educator, and subject-matter expert on criminal justice. As part of an effort to create a truly fair justice system he has already jump-started reform in areas of prosecution and punishment. He prepares free, downloadable videos on litigation, legal writing, and advocacy, through his employment as the Public Policy Advisor of Correcting Injustice, Inc. Frank Amodeo remains passionate about providing all citizens accessible education on how to master the ins and outs of the criminal justice system.

A work in progress, Amodeo has also been instrumental in establishing the Bright Canary Project. Bright Canary entails establishing multi-resourced private facilities that provide shelter, health screenings, and refuge for disadvantaged women, children, elderly, and disabled populations. This includes Amodeo further lending his skills to civil rights actions protecting the disabled and other protected, minority groups.

Next up, the halfway house requested Amodeo volunteer to speak to other inmates concerning their rights under the First Step; and what actions and attitudes are needed to enhance and reenforce the rehabilitative lessons of prison.

## 3.  If in the prison system, Amodeo will suffer permanent injury and likely death. In contrast, if Amodeo were in the community, society is not at risk of harm.

### A. Bureau of Prisons custody classification method classifies Amodeo as a minimum-security risk.

The procedure for calculating the security classification of BOP inmates is set forth under BOP Program Statement P5100.08, "Inmate Security Designation and Custody Classification."

This calculation determines what type of prison an inmate is housed in; and whether an inmate may have contact with the public. Over the BOP's history, this measure has proved extremely accurate. Under that rubric, Amodeo has a score of zero, a base security classification of minimum security, and an out-custody designation. In other words, the BOP finds Amodeo neither a risk to the prison or the community.

## B. The Government's actions support the conclusion that Amodeo Poses no risk to society.

Not only do the BOP's policies support's Amodeo's assertion that he poses no risk to the community, but, furthermore, the governments' own conduct during Amodeo's incarceration buttresses this contention. For example, placed on home confinement, the BOP allows Amodeo to live alone, a circumstance the BOP would not allow if Amodeo posed ANY risk to anyone. Equally, Amodeo has been authorized to have direct contact with the Assistant United States Attorney representing the government in an action where Amodeo appeared *pro se*.[43] As mentioned early, Amodeo was asked to instruct halfway house residents and home confines. Furthermore, BOP staff continues to refer inmate legal inquiries to Amodeo.

## C. That the prison relied upon and trusted Amodeo's opinion furthers the conclusion that Amodeo does not pose a risk to the community

On one occasion, on Amodeo's representations, in order to avoid a melee or riot, Coleman conducted a prison-wide recall, a rare event under any circumstances, unique to Amodeo, when requested by an inmate. Coleman's administration allowed Amodeo access to sensitive and private information (e.g., Presentence Investigation Reports) in order for him to help inmates with legal

---

[43] For purposes of security and privacy, the name of opposing counsel is withheld, but available to be filed under seal, if needed.

matters. And staff members often sought his advice on personal as well as prisoner matter; matters as diverse as application for new employment to the creations of wills.

**D.  Private agencies and institutions vet and approve for sensitive positions.**

In addition, Amodeo has cleared rigorous background checks performed by LexisNexis in order to provide him credentials to operate its due diligence database, Nexis Diligence. As a part of his role at Correcting Injustice, Inc., he serves as a consultant to various commercial enterprises, consequently, several financial and insurance institutions have reviewed Amodeo's background, and these have found Amodeo's advisory role to be acceptable.

**E.  U.S Sentencing Commission studies show Amodeo is not a risk to recidivate.**

The United States Sentencing Commission ("USSC"), the government entity responsible for setting forth the guidelines for sentencing of federal inmates, has conducted several studies relevant to the issue of recidivism particularly with respect to the impact of an inmate's age. These studies show the 61-year-old Amodeo is not a risk to society.

The USSC impact-of-age studies show older offenders were substantially less likely than younger offenders to recidivate following release n recidivism rates. *See* "*The Effects of Aging on Recidivism*," (U.S.S.C. 2017). (*Id. at p. 3*).  Over an eight-year follow-up period, 13.4% of offenders - age 65 or older at the time of release were rearrested (including technical violations of supervised release) compared to 67.6% of offenders younger than age 21 at the time of release. The pattern was consistent across age groupings, and recidivism measured by rearrest, reconviction, and reincarceration rates all declined as age increased. *Id*.

An offender's education level further influenced recidivism across almost all categories.[44] For example, among offenders aged 60 or older at the time of release, college graduates had a somewhat lower rearrest rate (11.6%) than offenders who did not complete high school.[45]

Also, the type of federal offense committed affected recidivism rates across all age groups. For example, firearms offenders had a substantially higher rearrest rate than drug trafficking offenders. Relatedly, for offenders aged 60 and older at the time of release, the rearrest rates were lower in correlation to age – 30.2% for firearms, 17.5% for drug trafficking, and 12.5% for fraud.[46]

In sum, it is well-established that older offenders are at lower risk for re-offending, and the USSC has confirmed this finding for federal offender populations. *Id*. at p. 10. Those over sixty years old had the lowest recidivism rate at 16% (a rate that includes rearrest for noncriminal, technical violations of supervised release). *Id.*

Amodeo is sixty-one, he served more than a decade in prison[47], has not an iota of violence in his history, and has post-doctoral education, under the Sentencing Commission analysis he is not a risk to engage in criminal conduct.

## F. PATTERN: The Department of Justice's multiyear, multimillion dollar recidivism assessment tool places Amodeo in the category with the lowest risk of recidivism.

To better manage federal prisoners, The Department of Justice surveyed all major recidivism predictive models and created an analytic method designed to identify and to reduce the risk of a federal prisoner reoffending. The method referred to as Prisoner Assessment Tool Targeting Risk and Need (PATTERN) is in effect throughout the federal prison system. In January

---

[44] Older offenders were less likely to recidivate after release than younger offenders who had served similar sentences, regardless of the length of the sentence imposed.

[45] Id

[46] Id

[47] U.S.S.C. shows steady decline in the rate of recidivism for those who serve up to 10 years in prison, longer periods have only de minimis or negative effects.

2020, the prison conducted an initial assessment of Amodeo and found him to be a minimum risk of recidivism and no risk for violence. In the ensuing months, Amodeo's PATTERN score decreased as a result of his aging and educational programming efforts (such as teaching).

**His scoring is shown below for each category:**

| I. PATTERN | GENERAL | VIOLENCE |
|---|---|---|
| 1. Current Age | 0 | 0 |
| 2. Sex Offender | 0 | 0 |
| 3. Violence | 0 | 0 |
| 4. Criminal History Points | 8 | 4 |
| 5. Escapes | 0 | 0 |
| 6. Violent History | 0 | 0 |
| 7. Education | (-4) | (-2) |
| 8. Drug Program Status | 0 | 0 |
| 9. Incident Reports (10 years) | 0 | 0 |
| 10. Serious Incident Reports | 0 | 0 |
| 11. Time Since Lost Incident | 0 | 0 |
| 12. Time Since Serious Incident | 0 | 0 |
| 13. FRP | 0 | 0 |
| 14. Programs* | (-2) | (-1) |
| 15. Work Programs | (-2) | (-2) |

_____

|  | 0 | -1 |
|---|---|---|

Simply, Amodeo's score is now less than 0, and 0 – 10 points warrant minimum rating. Accordingly, the DOT analysis finds that Amodeo is not a risk to the community.

### Synthesizing Analytic Methods

Multiple anecdotal events and the primary classification method of (1) the Bureau of Prisons, (2) the Sentencing Commission, and (3) the Department of Justice reveal that Amodeo is not a risk to society, thus further incarceration serves no purpose. Instead, any such incarceration places Amodeo of risk of life and limb; Thereby, converting Amodeo's prison term into a likely death sentence; a true travesty of Justice.

### CONCLUSION

For twelve years, the BOP and the United States, failed in its constitutional and legal duties to properly provide medical treatment to Mr. Amodeo. In the COVID-19 era, the BOP has less resources. Thus, inevitably, in the COVID-19 era, the BOP cannot care for and treat Amodeo's health conditions, i.e., it did not when it had more resources and less problem, hence it is inconceivable it can do so now.

Moreover, the very physical structure of the BOP prevents it from containing the spread of the COVID-19 epidemic. For Amodeo that consequence of the BOP's inadequacy is likely death. To the extent the vaccines work at all, Amodeo's doctors have prescribed against such treatment for Amodeo. Given Amodeo's comorbidities, if he is incarcerated in prison, then he will likely die. Even if Amodeo were not arguably innocent, his conviction does not warrant capital punishment. The government has an alternative to the *de facto* death sentence, it can designate Amodeo to home confinement.

Of course, given Amodeo's scores on the BOP, the DOJ, and the U.S. Sentencing Commission risk tests, there appears no reason why Amodeo's sentence should not be ended. Amodeo would remain under the supervisions of the U.S. Probation; and in the light of his fifteen-month home confinement performance and twelve years of remarkable rehabilitation, such supervision would satisfy the interest of justice.

Respectfully submitted this 2~~5~~th day of O~~ctober~~ 2021:
1st November

_____

Paul Rene, Next Friend

and State Appointed Guardian for

Frank Amodeo

### STATEMENT OF NEXT FRIEND

I have been Frank Amodeo's friend for over 16 tears. In April 2021 the State of Florida appointed me part of a guardianship committee that makes decisions concerning the person and property of Frank Amodeo. (Order Attaches as Exhibit "1"); see In Re Guardianship of Frank Amodeo, 2008-cp-1369 (Ninth Judicial Circuit for Orange County, Fla. 2008).

Mr. Amodeo is legally unable to commence manage or settle any legal action. Id.; see Fed. R. Civ. P. 17 (b); see also 28 U.S.C. § 1738. Further, Mr. Amodeo is in Seminole County Jail without access to notebook paper let alone forms, legal authority, word processors, etc.

Simply, as both a practical and legal matter Mr. Amodeo lacks the authority to bring this Action. See United States v. Amodeo, 6:08-cr-0176-Orl-JA-LRH, (M.D. Fla. 2020) (Doc. 338-1 at 2) ("because Mr. Amodeo has been found not competent to participate here . . .").

Mr. Amodeo's life is imminent danger, I and Mr. Amodeo's other two guardians could not in good conscience wait any longer to protect our ward. Hence, I with the committees as authorized submit this petition on Mr. Amodeo's behalf and beg this court to save Mr. Amodeo from crippling debilitation or death.

## VERIFICATION

Under penalty of perjury as authorized in 28 U.S.C. §1746, I declare that the factual allegations and factual statements contained in this document are true and correct to the best of my knowledge.

Frank Amodeo
776 N. Orange Ave, Apt. 5109
Orlando, Florida 32801

24

Exibit "1": Order Appoint GUARDIANS AND
Reference in the Next Friend Statement.

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL
CIRCUIT IN AND FOR ORANGE COUNTY, FLORIDA
PROBATE DIVISION

IN RE: GUARDIANSHIP OF
FRANK AMODEO                          CASE NO. 48-2008-CP-001369-O

_____/

## ORDER APPOINTING CO-GUARDIANS

**THIS CAUSE**, came to be heard upon the Guardian, Charles Rahn's,
Motion for Appointment of additional co-guardians for the Ward, Frank Amodeo
(the "Ward"). The Court, having jurisdiction and being fully advised.

It is ORDERED AND ADJUDGED that:

1. Deborah Milotte and Paul Rene, Jr. are qualified to serve and are hereby
   appointed as limited Co-Guardians, along with the current guardian
   Charles Rahn, of the person and property of Frank Amodeo.

2. In the event of a dispute among the guardians, the decision will be made
   by majority rule. The co-guardians must confer, in good faith, with one
   another prior to making decisions.

3. The powers and duties of the Co-Guardians are the same as those set
   forth in the June 9, 2015 Order appointing Charles Rahn as Guardian of
   the Ward, except as set forth herein.

4. No bond is due and payable to the Governor of the State of Florida and to
   all successors in office conditioned on the faithful performance of all
   duties by the guardian. Letters of Guardianship will issue forthwith.

5. The Court is not aware whether the Ward, prior to incapacity, has executed any valid DNR or advance directive under Chapter 765, Florida Statutes.  If any such DNR or advance directive exits, the Co-Guardians shall exercise no authority over a health care surrogate until further order of this Court.  Further, the Co-Guardians may not execute a DNR or advance directive without an Order from this Court.

**DONE AND ORDERED** in chambers in Orlando, Orange County, Florida this 5th day of April, 2021.

eSigned by Leticia Marques  04/05/2021 10:49:03 9IblMGZL
_____
Leticia J. Marques
Circuit Judge

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by submission to the Court's ECF system to all counsel of record on this ___ day of April, 2021.

_____

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL
CIRCUIT IN AND FOR ORANGE COUNTY, FLORIDA
PROBATE DIVISION

IN RE: GUARDIANSHIP OF
FRANK AMODEO

2008-CP-001369

_FILED IN OPEN COURT_
_By_
_Clerk, Cir Ct, Orange Co., FL_
_6-9-15_
_D.C._

## ORDER APPOINTING GUARDIAN

THIS CAUSE having come before this Court on the Petition for Appointment of

Successor Guardian for the Ward, Frank Amodeo (the "Ward"), who is represented by

counsel in these proceedings and it appearing to the court that the Ward is an

incapacitated adult in need of a limited guardian of the person and property. The court

having jurisdiction and being fully advised;

It is ORDERED AND ADJUDGED that:

1.      Charles Rahn is qualified to serve and is hereby appointed as limited
guardian of the person and property of Frank Amodeo.

2.      The nature of the Ward's incapacity is that he suffers from Bipolar
Disorder, Type 1, most recent episode manic, moderate.

3.      The powers and duties of the Guardian are:

( x ) to make and enter into contracts;
( x ) to consent to or refuse medical or other professional care, counseling,
treatment or service;
( x ) to control, dispose or manage real or personal property, businesses, or
income from any source;
( x ) to initiate, defend or settle lawsuits; and
( x ) to pay or collect debts.

4.      The Guardian shall exercise only the rights that the Court has found the
Ward incapable of exercising on his own behalf, as outlined herein above. Said rights
are hereby removed from the Ward and specifically delegated to the Guardian.

5.      Upon taking the prescribed oath, filing designation of resident agent and
acceptance and entering into a bond in the amount of **NONE** _____ payable    to

the Governor of the State of Florida and to all successors in office conditioned on the faithful performance of all duties by the guardian, letters of guardianship shall be issued.

6.     The Court is not aware whether the Ward, prior to incapacity, has executed any valid advance directive under Chapter 765, Florida Statutes. If any such advance directive exists, the guardian shall exercise no authority over a health care surrogate until further order of this Court.

DONE AND ORDERED in Chambers in Orlando, Orange County, Florida this _____ day of June, 2015.

HONORABLE JOSE R. RODRIGUEZ
Circuit Court Judge

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that conformed copies have been furnished on this _9 th_ day of June, 2015, to the following:

MYRA P. NICHOLSON
PINONICHOLSON, PLLC
189 SOUTH ORANGE AVE., STE. 1650
ORLANDO, FL 32806
myra@pinonicholsonlaw.com

CHARLES RAHN
4589 SOUTHFIELD AVENUE
ORLANDO, FL 328012

BRIAN D. HORWITZ
VATIC LAW
3236 LAKE GEORGE COVE DR.
ORLANDO, FL 32812
bhorwitz@vaticlaw.com

Frank Amodeo, #48883-019
FCI Coleman Low
P.O. Box 1031
Coleman, Florida 33521

Judicial Assistant/Attorney

2

Exibit "2":

Transcript Referenced In the Statement of Next Friend
in each pleading.

1

1          UNITED STATES DISTRICT COURT
           MIDDLE DISTRICT OF FLORIDA
2              ORLANDO DIVISION

3

4   . . . . . . . . . . . . . . .
                              :
5   UNITED STATES OF AMERICA,  :
                              :
6          Plaintiff,          :
                              :    Case Number
7   vs.                        :    6:08-CR-176-ORL-28LRH
                              :
8   FRANK L. AMODEO,           :
                              :
9          Defendant.          :
    . . . . . . . . . . . . . . :
10

11
          MONDAY, JANUARY 13, 2020; 11:25 A.M.
12             STATUS CONFERENCE
       BEFORE THE HONORABLE JOHN ANTOON II
13          UNITED STATES DISTRICT JUDGE

14

15  APPEARANCES:

16  GOVERNMENT COUNSEL:
     Maria Guzman
17

18  DEFENSE COUNSEL:
     Rosemary Cakmis
19
     Brian Horwitz
20    (Attorney for guardian)

21

22

23  Official Court Reporter:
    K. Stanford
24  _____
    Proceedings recorded by mechanical stenography.
25  Transcript produced by computer.

1                     P R O C E E D I N G S

2         THE COURTROOM DEPUTY:  This is in the matter of the

3  United States of America versus Frank Amodeo, Case Number

4  6:08-Criminal-176-Orlando-28LRH.

5         Will counsel please state your name for the record.

6         MS. GUZMAN:  Good afternoon, Your Honor.  I'm Maria

7  Guzman on behalf of the government.

8         MS. CAKMIS:  Rosemary Cakmis.

9         MR. HORWITZ:  Brian Horwitz for guardian --

10 state-appointed guardian Charles Rahn.

11        THE COURT:  Okay.  Please be seated.

12        It's always nice to have counsel assist with

13 problems, but I have -- can't tell you how delighted I am to

14 see Ms. Guzman and Ms. Cakmis here today, not shortchanging

15 you, but your role is different, and I've heard from you

16 before on this, and I think we need some fresh ideas, and I'm

17 hoping that we can try to unravel this gnarled nest of motions

18 and filings that have gone on for so long.

19        I might also add that it's quite ironic that

20 Mr. Horwitz represents Mr. Rahn, who is the guardian of

21 Mr. Amodeo, because Mr. Amodeo has been found not competent to

22 participate here; whereas, he's known throughout the -- not

23 just the Middle District, but districts in Florida, and my

24 guess is probably districts around the country for his quality

25 assistance of prisoners and filing papers, but that's neither

3

1   here nor there, just an observation.

2        Let me start off by asking Ms. Cakmis, what is the

3   scope of your representation here?

4        MS. CAKMIS:  As of today, Your Honor, we are

5   technically no longer representing Mr. Amodeo.  We were

6   appointed for an appeal.  As it turns out, he had another

7   appeal pending with the same issues, so the Eleventh Circuit

8   consolidated the two appeals.  Anne Marie Borghetti is a CJA

9   lawyer who was appointed for the other appeal.  And when the

10  Court consolidated the two appeals, it specifically took me

11  off and let her have both of them.  That was the extent of our

12  representation, because we previously had been appointed under

13  the omnibus order for Section 404 of the First Step Act.

14  We filed a notice of satisfaction under the First Step Act,

15  Section 404, and that essentially terminated our

16  representation.

17       My understanding is that Mr. Amodeo wants us to

18  represent him on compassionate release.  A compassionate

19  release motion is not currently pending before the Court.

20  But should the Court appoint our office for the compassionate

21  release, we would file such motion when it's appropriate.

22  At this point there's questions about exhaustion of

23  administrative remedies, the timing of the warden's denial.

24  That can all be sorted out by counsel once we're appointed.

25       We have been appointed in a number of other

4

1  compassionate release cases recently.  And I -- that would be

2  our position as of today.

3      THE COURT:  Okay.  Well, that's helpful.  That's a

4  start.  I look at it as a ball, a fishing line where there's

5  been a -- the reel is filed and we have to find the end of it,

6  and that's the end of the line.

7      You, Mr. Horwitz, don't represent him for

8  compassionate release, right?

9      MR. HORWITZ:  That's correct, Your Honor.

10      THE COURT:  So you're of no help, because you can't

11  file a motion, you say.

12      MR. HORWITZ:  I was able -- I filed a motion on

13  behalf of Charles Rahn, because Charles Rahn is not an

14  attorney and couldn't file something on behalf of his ward.

15  But that's correct, I do not represent --

16      THE COURT:  And Mr. Rahn is not filing a motion

17  through you?

18      MR. HORWITZ:  If no one else is appointed, I suppose

19  we could.

20      THE COURT:  You were listening to what Ms. Cakmis

21  said, right?

22      MR. HORWITZ:  No, I understand that.  And at this

23  juncture, it was our understanding that Ms. Cakmis either was

24  going to be working on this motion or would be -- was either

25  previously appointed to it or would be in the future.

5

1   Mr. Rahn doesn't have the resources to have me do this.

2           THE COURT:  To file the motion to get the public

3   defender appointed?

4           MR. HORWITZ:  Well, I mean that's -- I believe

5   that's what we started with was we were attempting to file a

6   motion.

7           THE COURT:  Well, wait a minute.  What --

8           MR. HORWITZ:  In fact, the document that I filed was

9   related to the First Step Act.

10          So yes, if we needed to file a motion to have

11  counsel appointed for the compassionate release motion, I

12  could file a motion and have counsel appointed, yes.

13          THE COURT:  You would file a motion for

14  compassionate release and then ask that counsel be appointed

15  to go forward with it?

16          MR. HORWITZ:  Honestly from a financial perspective,

17  I would prefer -- and from an experiential perspective, I

18  would prefer and suggest that someone that has some experience

19  with dealing with compassionate release motions be appointed

20  to do the filing itself or to determine if the filing is

21  appropriate.

22          THE COURT:  I'm going to give you two a chance to

23  talk for a second before I hear from -- Ms. Cakmis, would you

24  talk to Mr. Horwitz, please?

25          MS. CAKMIS:  Yes, sir.

1    (Pause in proceedings.)

2         MS. CAKMIS:  Your Honor, I believe Mr. Amodeo,

3    Mr. Horwitz, and myself, are all in agreement that if the

4    Court deems it fit, the best course of action would be to

5    appoint the Federal Defender to represent Mr. Amodeo on the

6    compassionate release.  We have a number of these motions that

7    we've been appointed --

8         THE COURT:  But do you need something filed first?

9         MS. CAKMIS:  No, sir.

10        THE COURT:  Okay.  You're appointed.

11        MS. CAKMIS:  Thank you.

12        THE COURT:  Now, would you advise the Court, Ms.

13   Cakmis, as to whether I should permit Mr. Donovan Davis to

14   continue to make -- to file papers in this proceeding?

15        MS. CAKMIS:  As to the compassionate release?

16        THE COURT:  To anything.

17        MS. CAKMIS:  Your Honor --

18        THE COURT:  Well, maybe that's not fair.

19        To compassionate release, I'll leave it at that.

20        MS. CAKMIS:  -- as to compassionate release, now

21   that counsel has been appointed, nothing pro se, whether

22   through Mr. Davis, Mr. Amodeo, or Mr. Rahn, should be accepted

23   by the Court as to compassionate release.

24        THE COURT:  Ms. Guzman, do you agree with that?

25        MS. GUZMAN:  I absolutely agree, Your Honor.

7

1        THE COURT:  One minute, please.

2        (Pause in proceedings.)

3        THE COURT:  Okay.  Ms. Guzman, is there anything

4   else that you need to bring to my attention?

5        MS. GUZMAN:  No, Your Honor.  We believe -- the

6   government believes that, as the Court has already done, the

7   Federal Public Defender's Office should be appointed to

8   represent Mr. Amodeo's interest with regards to the

9   compassionate release portion of the First Step Act.

10        And we agree that more correspondence from Mr. Davis

11   would only muddy the issues, confuse the issues before the

12   Court and probably make the position and the job of the

13   Federal Public Defender's Office all the more difficult.

14        Mr. Donovan -- Mr. Davis, himself, in one of his

15   pleadings that I think filed with the Court asked for the

16   Court to appoint counsel.  So the Court has appointed counsel,

17   they have appointed the Federal Defender's Office, and I think

18   that's where it ends so that they can do their job.

19        THE COURT:  Okay.

20        Anything else I need to address, Ms. Cakmis?

21        MS. CAKMIS:  No, Your Honor.

22        THE COURT:  Mr. Horwitz?

23        MR. HORWITZ:  The one thing that I would request --

24   and I don't know if this is correct for today, but one of my

25   jobs as -- and I'm sorry -- one of my jobs as attorney for the

1  state-appointed guardian is to file an annual report with the

2  state court.  And one of the components of that annual report

3  is supposed to be Mr. Amodeo's medical records.

4         I have been unable to get the prison to release

5  those medical records to me.  So I don't know if Ms. Cakmis

6  or someone else needs to order -- ask for an order to be

7  issued ordering the Bureau of Prisons to release Mr. --

8         THE COURT:  No, I don't think that would be in her

9  purview.

10        MR. HORWITZ:  Okay.

11        THE COURT:  Do you?

12        MS. CAKMIS:  I would ask the Bureau of Prisons to

13 release the medical records to me.

14        THE COURT:  To you, yeah.

15        MS. CAKMIS:  We have forms for that.  Once they are

16 released to me, HIPAA prohibits me from disbursing them.

17        THE COURT:  Yeah.  You need to work with the Bureau

18 of Prisons to get that, if he's the guardian.  And I don't

19 know what the administrative procedure is there, but I don't

20 have jurisdiction to order her, Ms. Cakmis, to do that at this

21 point.

22        MR. HORWITZ:  Okay.  And I wasn't -- that's fine.

23 I just had issues with the BOP in the past trying to get them,

24 so --

25        THE COURT:  Yeah.  Well --

9

1       MR. HORWITZ:  If there's -- if Ms. Cakmis has a
2   procedure that works, and then we can figure out --
3       THE COURT:  It's like a lot of entities, government
4   and otherwise, it depends on the person you reach when you're
5   trying to contact --
6       MR. HORWITZ:  I would a hundred percent agree,
7   Your Honor.
8       MS. CAKMIS:  I think it's possible also for
9   Mr. Amodeo to waive -- and I'm not sure about how his capacity
10  factors in, but he could waive the confidentiality.
11      THE COURT:  Mr. Rahn could waive it for him, yeah.
12      MR. HORWITZ:  Mr. Rahn would have to sign the
13  waiver.  Anyway, we can do that.
14      THE COURT:  Okay.
15      MR. HORWITZ:  Thank you, Your Honor.
16      THE COURT:  Okay.  Well, I'm happy to have counsel
17  on board in this case, and I am looking forward to resolving
18  some of the pending issues.
19      I'm not going to strike the filings that Mr. Davis
20  has made.  I think they've been discussed enough in the papers
21  and here today that they should remain in the file.  But I do
22  order, and I'll reduce this to writing, that he not file any
23  more papers in this case and that any papers he does file be
24  stricken.  Okay?
25      MS. CAKMIS:  Thank you, Your Honor.

1           MR. HORWITZ:  Thank you, Your Honor.

2           THE COURT:  Thanks a lot.

3           MS. GUZMAN:  Thank you, Your Honor.

4           THE COURT:  Have a good day.

5       (Adjourned at 11:38 a.m.)

6                    *  *  *  *  *  *

7               Certificate of Official Reporter

8   I certify that the foregoing is a correct transcript of

9   the record of proceedings held in the above-entitled matter.

10  s/Koretta Stanford_____
    Official Court Reporter
11  United States District Court
    Middle District of Florida        Date:   2/23/2020
12

13

14

15

16

17

18

19

20

21

22

23

24

25